Good morning, Your Honor. Good morning. May it please the Court. My name is Richard Levine, and I represent Mr. Olszewski and four other former employees of a subsidiary of the Elsevier Company. Appellants appeal the district court's grant of a 12B motion with prejudice. Claims in this case arise from the following circumstances. The appellants are five long-term former employees of the MDL Group, which was, until October 1, 2007, a wholly owned subsidiary of defendant appellee Elsevier, Inc. At that time, October 1, 2007, Elsevier was in the process of a transaction pursuant to which MDL Group was being sold to defendant appellee Symyx Technologies. At some point during the evening of October 1, 2007, the transaction closed. The transaction was pursuant to a purchase and sale agreement which had indicated and stated that Symyx would employ all the employees of the MDL Group, former Elsevier employees, on substantially similar terms with substantially similar benefits as those employees had enjoyed while working for Elsevier. By the time these appellants awoke the next morning, October 2, they had been terminated. And although they had left work on October 1, employees of Elsevier, subject to an Elsevier severance plan, when they woke up on October 2, they were told that they were now employees of Symyx and that they had been terminated, and that they were now subject to a Symyx severance plan which had been prepared prior to the acquisition closing and which substantially cut the severance benefits that they would have received had they been terminated by Elsevier. Could I just ask you a question? Because we have read the briefs and we are familiar with the facts. In your reply brief, you concede that the severance benefits plan could have been unilaterally modified or suspended by Elsevier, is that correct? At any time before the sale of MDL to Symyx, at midnight on October 1, 2007. If Elsevier had modified its plan to look like the Symyx plan on October 1, 2007, would your clients still have a claim under ERISA? They might, Your Honor. It would depend on how soon prior to that event the modification took place and whether there was evidence of bad faith and whether there was the fact that they could have changed it is inarguable. It is a discretionary plan. What they can't do is change it in bad faith or change it to specifically disadvantage a beneficiary of the plan just as the benefit, which is governed by ERISA, is about to ripen. It's kind of an odd thing because you don't really vest, per se, in severance payments. It's a different animal than your retirement. So it seems like a lot of that discussion, which floats around, isn't relevant. But I'm having some trouble understanding if you could make the change and we'll start with the beginning. There's no doubt that they can sell the company and they could say everybody who was an employee yesterday is an employee of the new company. That's fine, correct? That's correct, Your Honor. Okay. So when they wake up, they're employees of the new company, correct? Correct, Your Honor. And the new company? Well, if I may, Your Honor, may I back off of that for a moment? In the case that I presented pursuant to the 28J letter, the Howley v. Mellon Financial Corporation case, the Third Circuit noted that in a substantially similar situation, virtually identical, that the employment with the acquirer was not bona fide and they did not regard, the Third Circuit did not, and indeed the trial court in Pennsylvania also, did not regard that termination as bona fide, excuse me, that employment as bona fide since the employees in Howley were never in fact, other than kind of as a technical matter pursuant to the acquisition, employees of the acquiring company. And therefore, that court held. That court sustained a summary judgment, I believe, in favor of the plaintiff employees with respect to their entitlement to severance pay under the selling parents plan. And I think in this case, although certainly it could be the case, and was the case presumably for loads of other former employees of Elsevier, that they became bona fide employees of Simic's. These employees did not. These employees never worked for Simic's, never walked in the door of Simic's employees. They were given to understand, notwithstanding the fact that they weren't third-party beneficiaries, they were given to understand by the purchase and sale agreement, which was a published and public document, that all employees were to be employed and that they would have substantially similar benefits. And when they woke up the next morning, they'd been terminated. And the benefit of the severance benefit, which, as Your Honor rightly points out, doesn't vest in the sense that retirement benefits vest, as it ripened was taken away from them. And that was a circumstance that was anticipated and planned by these two defendants, because the new Simic's severance plan was prepared prior to the closing. The terminations were set up prior to the closing, as the evidence demonstrates. And I can speak more specifically to that if you'd like, Your Honor. Well, no, there's no evidence here. There's only a complaint. So, I mean, there's allegations. That's where we are at this stage. But there is some record, which the trial court referred to. Correct. And that record includes, for instance, the October 2 termination letter. The warn notice. Well, the warn notice and the termination letter, which says you are already terminated. Good morning. It's October 2. So I don't know if I've answered your question. Well, I mean, no. I haven't really. I mean, I'm still having some trouble understanding if generally one company sells to another, and you wake up and now you're an employee of the new company because the old company ceases to exist, presumably at midnight. I didn't check. Is that the? It's not precisely what. Is it not precise? It's not precisely what happened. When does it close? The close, we don't know exactly when the close is, because we haven't been permitted to take any discovery. But the October 2 termination letter says we anticipate that the close will be at midnight on October 1. So presumably the close was somewhere around midnight on October 1. Now, MDL, the MDL group did not cease to exist, nor did Elsevier cease to exist. The MDL group was a wholly owned subsidiary of Elsevier, and it was an equity transaction. So the MDL group moved to Cimex, precisely as was the case in the Howley v. Mellon Financial Corporation circumstance. So that's what happened. These employees moved and were immediately terminated. What about the district court's view that, as framed, the complaint was speculative or didn't have enough to pass muster under this, what I guess I call it, the collusion allegation? Maybe there's a better way to frame it. But that's how I read it. No, I mean, that's essentially what it is, Your Honor. Obviously, we think the district court was wrong. And there are substantial allegations as to the facts giving rise to an inference of collusion. And, again, I would urge the Court to refer to the Howley case because the situation is virtually identical. In this case, there was a new Cimex plan applying specifically to the MDL employees that was prepared prior to the close of the transaction. In this case, there was a determination made to terminate certain persons, including these long-term employees who had substantial benefits under the Elsevier plan. That was done before the transaction. The letter itself demonstrates that it was done before the transaction. Thus, there was certainly cooperation between the parties in that regard. That's number one. Number two, again, as the Court specifically discussed, the Third Circuit discussed in the Mellon case, money was saved by both defendants by this device. Rather than having a severance plan that topped out at 52 weeks of pay, they had a severance plan that topped out at 24 weeks of pay. That was a substantial saving both for Elsevier and for Cimex. So those facts, I would urge, certainly supply a basis for an inference which was found persuasive, sufficiently persuasive for judgment on behalf of the plaintiffs in the Howley case. In this case, we're only looking to go into discovery. It's possible that Your Honor will find in favor of us, permit us to proceed in the case, and that discovery will not bear out what we think to be the case. We think that the Elsevier policy as applied, in fact, provides severance to persons in the situation of these plaintiffs.  But that inference is certainly not an inference which is unsustainable. And the Court below, in finding the, if you will, collusion aspect of the case improbable, was guided by the Iqbal v. Ashcroft case, which is, with all due respect, not the same sort of case at all. I mean, there is substantial evidence, in fact, I don't think it's denied that the defendants cooperated, shared information, and that the action of terminating these employees, which was planned prior to the actual close of the transaction, saved money for both parties. I would suggest that that is sufficient as the basis for an inference. And, again, it was in the Third Circuit just a few months ago. Thank you. You want to save the remaining time? I think I better. Thank you, Your Honor. Good morning, and may it please the Court. Steve Friedlander on behalf of Apelli Cimex Technologies, Inc. and Elsevier, Inc. We believe there are three straightforward reasons why the district court determined correctly that the motion to dismiss should be granted with prejudice. First, the Cimex plan superseded the policy that was in place for the MDL employees prior to the Cimex transaction. Second, there's no plausible basis for plaintiffs to claim any right to severance under that prior policy. And third, with respect to the 510 claim, the third claim has been dropped in this appeal by appellants. With respect to the 510 claim, it's not plausible to suggest that the parties conspired, number one. And number two, and I think more importantly, it's an entirely derivative claim to the first claim. And so if they're not entitled to benefits in the first place, they're not entitled to receive a remedy for interference with those benefits. What I don't understand is your claim that it's not plausible to conclude that there was collusion. So if I may, Your Honor, the reason why we think it's not plausible to say that there was collusion is that this was a welfare benefit plan. And I disagree with counsel's characterization of some of the record, and I think it's important to correct it for purposes of answering your question. What happened here was that MDL was a subsidiary of Elsevier. There was then a transaction which occurred on October 1. And by the way, we have more than the complaint here. We have the attachments to the complaint, which are the sale agreement. We have the warn letter, and we have the two plans. But they're all part of the complaint. They're referenced in the complaint. Yes. And also, with respect to the Freitas Declaration, we have the MDL handbook policy. Right. And the Jackson Declaration has the SIMEX plan. So in connection with the transaction, which was cash for stock, there was never any change in employer. There was a change in the owner of the employer, but the fiction that there was a different that they, you know, woke up and they were told by another company that they weren't working there just doesn't work in connection with this transaction, where they continued the same employer, and per Curtis Wright, per Norley, they had the right, as the employer, to rescind the welfare benefit plan any time they wanted. If you look at the handbook language, and we cite that about the discretion, and also in the severance, a couple of pages which are the severance policy portion of that handbook, it says this is not a contractual right. We can change it at any time. We don't need to give you advance notice, et cetera. And that's essentially what happened here. It's undisputed that the sequence of events, whether it was the night of the first or the notice was received on the morning of the second, is that there was a transaction that closed, that after that transaction closed, there was a CIMICS plan, or simultaneously with that transaction closing, there was a CIMICS plan put in place, and that the plaintiffs were offered benefits under the CIMICS plan. And finally, and critically important, the CIMICS plan explicitly supersedes any prior policy that previously applied to the MDL employees while owned by Elsevier. So that's our first point, that Curtis Wright and also Noraly are very clear that when we're talking about an unfunded, unvested welfare benefit plan, which is a severance plan such as this, it can be rescinded at any time without notice. That's up to the employer. And the cases say, look, if the employer wants to do that, that's their right. It may not be that incentivizing for employees to see that kind of discretion in a plan, but that's their right, and they can take that away. The second issue is if you look at the policy within the MDL handbook, I've never seen a case where there was a claim made under this kind of discretionary language, and I think that the briefs somewhat talk past one another, because there's really three kinds of discretion that we're talking about here. There's the discretion of the plan administrator, assuming the plan administrator is looking at a claim, and that is mostly what appellant's counsel is talking about in terms of their authorities on appeal. There's the second level of discretion, which is the discretion to rescind a welfare benefit plan, which certainly there is that discretion if you look at the handbook and the MDL policy on severance. And then there's the third level of discretion, which is the terms of the actual pages of the severance policy within the MDL handbook. It's may, it's no contractual right, et cetera. And it's very clear, and Gross-Solomon, which is a Ninth Circuit case, 237F3-1154, says that you need clear and expressed language to say when it is you have vested rights under this type of plan. Certainly if you look at the language of the MDL policy, there's not clear and expressed language that gives plaintiffs a right to severance under that policy, even if it applies. I guess I, and I don't want to put words in his mouth, but I thought I heard counsel essentially agree with me that this severance issue is not a vesting issue. That's what I thought he said, which is the same point you're making. That's the same point I'm making. And in terms of, and so, in other words, at the end of the day, they need to go back to the source document and see if they have a right to severance. And if you go back to this source document, the one that they say applies, the one that on page 3 of their opening brief they say contains the material terms that we're talking about for their claim, it's nothing but discretion and may, and this isn't a contractual right. So, in other words, if you're going to sell a company, it's okay to basically say, you know, let's get rid of these high, this group of high-paid employees, and we'll, today is Monday, sale will close tonight. When they wake up Tuesday, we give them a morn letter, and basically we lay them off, and they get this modified severance, because it will be the new owner. Now, you said it didn't matter if they have the same employer, but they don't, because it says they have CEMEX on their letter. So that's okay? Is anything, you're saying nothing's wrong with that scenario? No. What I'm saying is okay is that MDL had the right to rescind what was the unfunded welfare benefit plan at any point in the process, and it did that at any time that it wanted to, including a second before the deal closed. Did it do that? It did not. Well, I know it might have the right to, but if it didn't, then we're like in another ballgame, aren't we? Not really, because what CEMEX did, which was, again, its right, was it superseded any prior policy that might have existed. So what does it matter what MDL could have done? Well, it's only to say that it was a discretionary plan, and so Your Honor's suggestion that somehow there was unfairness in saying these people would get this and were taken away from them, I'm responding to that by saying it wasn't something that they could touch and feel, because it was discretionary and because the employer clearly had the right to unilaterally and without notice take it away. But MDL could have amended the plan at noon on October 1 and said, you know what, no more severance or only, you know, five weeks or four weeks severance, and then said, and we're going to sell our company, and note this section in our plan which says that things can change if you sell a company, and you're terminated. So that they could have done, but they didn't do that, right? Correct. They did not do that. And then you told me, though, that these people didn't have a new employer. They had the same employer. They were employed by MDL, and then they received notice. And they retained MDL on the second date as well, or no? So they received notice, which is Exhibit B to the Second Amendment complaint, and were told that their employment was terminated. Okay. I misunderstood you. I'm sorry. I misunderstood because I thought you said they still remained MDL employees. They remained. They turned into CIMEX employees. They turned into MDL employees, but MDL was then owned by CIMEX as of the close of the transaction. And so after that close of transaction, they were given the CIMEX severance plan, and they were told that they had the right to severance under that plan, and they were also told that they were terminated after the acquisition. Where does it say that the MDL plan goes out of existence? So if you look at the CIMEX plan, which is in the record at pages 64 to 87, let me just find it. You'll see that in the record page 67, Section 1 Introduction, it says in the last penultimate sentence there that the plan shall supersede any severance plan, benefit plan, policy, or practice previously maintained by the company or any employer. And employer is defined earlier to include the folks in Appendix A or the entities in Appendix A. And then if you look at Appendix A, that includes MDL, among others. That's record page 84. Who gave them the notice that they were terminated? So CIMEX sent the notice that they were terminated from their employment, which is Exhibit B of the Second Amendment complaint. So they were terminated then as employees of CIMEX, huh? Well, they continued on as employees of the subsidiary MDL. And so it more correctly should have been a notice from MDL as the subsidiary, but CIMEX did terminate their employment. So it was really CIMEX that did it and not elsewhere? It was definitely after the acquisition, and their employment with MDL, the subsidiary of CIMEX, was terminated by virtue of Exhibit B to the Second Amendment complaint. Well, I mean, I don't know. I mean, one of the things they say is, look, we're not even ever an employee of anything that relates to CIMEX because we never were terminated by MDL, and that's who we are an employee of. And therefore, we should we get the MDL rights. What's wrong? I don't know if that's true or not, but why at this stage of the pleadings should they not be able to determine as a matter of law whose employee they were and which plan applied and whether it applied properly? We think that it's a legal matter, and under IGBAL they should not be allowed that discovery because we have the CIMEX plan in place, and we know that as a matter of law, when someone acquires all the stock of another company, they become the owner of that company. So that's why we don't think there's a factual issue. Likewise, with respect to the policy within the MDL handbook, which does not give them any affirmative rights to severance, doesn't even require that MDL, when owned by Elsevier, make an affirmative act with respect to a severance claim. But the Elsevier plan does say that may pay severance in particular circumstances in a divestiture situation. So how does that survive, or how can that be foreclosed by a 12B6 motion? It seems like that's the question to be determined. Well, counsel and the other side have agreed that the terms, if you will, of the MDL policy are, as stated in the attachment to the Freitas Declaration, and that's in the record. If you look at, for example, record page 95, you see the disclaimer for the handbook, which says, among other things, the contents of this site do not confer any contractual rights whatsoever upon employees. The company may unilaterally add to, rescind, or change its policies and procedures, including those described in the site, which is the website where they have this handbook, at its discretion without having to consult with anyone, without obtaining anyone's approval, and without prior notice. Well, as Sheriff McKeon pointed out, that may be, but they didn't do it. That's correct. But what did occur, and the reality instead of the theory, is that Cimex properly determined to implement its own plan, which explicitly superseded and replaced this earlier policy with respect to these MDL employees. Could you comment on the Howley case that was submitted? Yes. We think it's distinguishable for the reasons that I've already discussed. In other words, number one, there was no superseding plan in Howley, as there is here. Number two, the antecedent policy was not discretionary in Howley. That was a case where the plan administrator had to interpret whether there was an exception to severance because these employees were continuing employment or not. And there was the word initially in terms of whether that required something which was temporal or not. And the plan administrator determined that, in fact, by being employed one day after, that was enough. And what the court said there was, no, that's an unreasonable reading given the purpose of that plan, again, a different purpose than what's at issue here. And so we would say that it's distinguishable on those two grounds. And then finally, you know, in the reply paper on appeal, counsel makes the statement that the SIMICS ‑‑ I'm sorry, the MDL policy was never superseded. And this was an issue that was dealt with. We believe that's incorrect, and we believe the SIMICS plan did supersede. And this was an issue that was dealt with in the trial court's opinion below. And I'll just point out that in the Sedgman case, S-E-J-M-A-N, 889F2nd, 1346, it's a Fourth Circuit case, that made very clear that there was no sort of vestigial remainder from the parents in terms of the policy, that once these employees in this division moved over to the new company, then the new company could supersede the policy that previously applied to their employees. Thank you. Did they move over to the new company, or did they remain employees of the subsidiary, Elsevier? We believe they remained employees of MDL, which was a subsidiary that was then owned by SIMICS after October 1. So SIMICS succeeds to Elsevier as the parent or the owner of the company? Correct. Then the company plan that controls, whereas, is this an operating entity or a sub, MDL? So MDL is a subsidiary wholly owned sub. Wholly owned subsidiary, okay. And it's in the sale agreement that SIMICS purchased all of the shares from Elsevier of MDL and then became the owner. And so just like when a new owner buys a company, you don't need to send out a bunch of offer letters to the employees unless you want to change their terms. In this case, they just continued on as employees of MDL, which was now owned by SIMICS. Thank you. Thank you. Just a couple of points, Your Honors. As I think Judge Hug noted, there is specific language in the Elsevier policy, which applied to these employees when MDL was owned by Elsevier, which indicates that in the divestment context, benefits might be available and that presumably discretion would be exercised by the administrator. But the law requires that that discretion is not unbridled. That discretion is subject to review. The court below viewed such discretion as effectively unreviewable, viewed the fact that Elsevier had chosen not to pay as the end of the question. And that is not the end of the question. Further, the fact that the divesting corporation severance plan may apply to employees who are no longer working for the divesting corporation is a fact that arose, for instance, in the ALGEE v. RCA Global Communications case, the citation for which is 60F3-956, Second Circuit, 1995. Elsevier specifically provided for the possibility that employees, former employees, in precisely the situation of these plaintiffs, might get severance under their policy. If it's totally discretionary and then the answer is no, they don't, where does that leave you? Well, where that leaves us is in the – that leaves us in a context discussed by numerous courts, including the Howell Court, which says discretion has to be measured by the arbitrary and capricious or abusive discretion standard. The statement under ERISA, the statement that, well, we have discretion, we can do what we want, doesn't mean that the exercise of that discretion, the process used to exercise that discretion is not to be reviewed. It is, in fact, to be reviewed, which is the principal mistake that, with all due respect, the court below here made. The fact that the employer, the former employer, chose not to pay is not the end of the question. The question – Well, this is a – I mean, I don't want to get into it all, but there are these different kinds of discretion that one is in plan language and other is in administering the plan. So, I mean, there are differences. That's correct. But one has to – discovery is required to determine what the purpose of the plan is. This is a defective ERISA plan. It has no procedures in it for appeal. It does not state its purpose clearly. It does not explain what one wants to – it doesn't explain how the discretion is to be exercised. Indeed – We have your point. Okay. I think we have your point. Thank you very much. Both sides well in mind on that. Olszewski v. Simeks is submitted. Thank both of you for your argument.
judges: Hug, Nelson D. W., McKeown